THE STATE v. JOHN O'KELLEY and W. D. FITCH, Appellants.

Division Two, May 26, 1914.

1. ILLEGAL SALE OF LIQUOR: Partnership: No Licensed Pharmacist in Drug Store. The defendants, partners in a pseudo-drug store, not having a pharmacist's license, and having no licensed pharmacist in their employ, were not druggists in contemplation of our statute, and they had no right to sell whisky either with a prescription or without it.

2. ———: ———: ———: Sale by One Partner in Absence of Other. Where partners in the conduct of a store were not licensed pharmacists and had no licensed pharmacist in their employ, the very nature of the partnership, so far as the sale of liquor was concerned, was a conspiracy to violate the law, and under these circumstances one partner was liable for a sale of liquor made by his copartner in his absence.

3. ARRAIGNMENT: Not Guilty: No Record Showing: Appeal. A judgment of conviction in any but a capital case will not be reversed because the record fails to show arraignment and a plea of not guilty, the defendant having offered no objection and having gone to trial without protest.

State v. O'Kelley and Fitch.

4. ———: ———: ———: ———: Waiver. Where in a mis-
demeanor case the defendant appeared in person and by at-
torneys and answered ready for trial, and after the information
was read counsel for defendant said, "No statement at this time
except we plead not guilty," and then went to trial, arraignment
and plea were waived.

Appeal from Dade Circuit Court—*Hon. B. G. Thurman,*
Judge.

AFFIRMED.

*Howard Ragsdale* and *J. O. Patterson* for appellants.

The court erred in refusing to grant defendants a new trial upon their motion and showing that there had been no arraignment or waiver of the same and that the record failed to disclose any arraignment or waiver. The arraignment of one accused on a criminal charge is an indispensable prerequisite to a legal trial. State v. Witherspoon, 231 Mo. 706; State v. Moss, 164 Mo. App. 379; State v. Mikel, 125 Mo. App. 289.

*John T. Barker,* Attorney-General, and *W. T. Rutherford,* Assistant Attorney-General, for the State.

(1) We desire first to call the attention of the court to Sec. 5230, R. S. 1909, which reads as follows: "The provisions of law in civil cases, relative to compelling the attendance and testimony of witnesses, their examination, the administration of oaths and affirmations and proceedings as for contempt, to enforce the remedies and protect the rights of parties, shall extend to criminal cases so far as they are in their nature applicable thereto, subject to the provisions contained in any statute." In this section is found this sentence: "To enforce the remedies and protect the rights of the parties," etc. This is a broad and

comprehensive sentence, and the State is evidently included in the term "parties." (2) A case in the appellate court should be decided upon the same theory upon which it was tried in the court below, and the case at bar having been tried upon the theory that a plea of not guilty had been entered on appeal, the case will be treated as if such plea had been entered. Brier v. Bank, 225 Mo. 638; St. Louis v. Contracting Co., 210 Mo. 502; Kilpatrick v. Wiley, 197 Mo. 171; Drug Co. v. Byber, 179 Mo. 369; Land Co. v. Zeitter, 182 Mo. 265; Dice v. Hamilton, 178 Mo. 90; Walker v. Owen, 79 Mo. 563; Mitchell v. Railroad, 125 Mo. 11; State v. Greene, 66 Iowa, 11; State v. Hayes, 67 Iowa, 27; People v. Tower, 17 N. Y. Supp. 395; People v. Johnson, 110 N. Y. 134; People v. Meyers, 2 Hun, 6; People v. Bradner, 107 N. Y. 1; People v. McHale, 15 N. Y. Supp. 496; Spicer v. People, 11 Ill. App. 294; State v. Thompson, 95 Iowa, 464; State v. Glave, 51 Kan. 330; State v. Lewis, 10 Kan. 157; State v. Cassady, 12 Kan. 550; U. S. v. Molloy, 31 Fed. 19; State v. Bowman, 78 Iowa, 519; Moon v. State, 51 Ark. 130; Hayden v. State, 55 Ark. 342, and cases cited in Attorney-General's brief; Johns v. State, 104 Ind. 557; Weir v. State, 115 Ind. 210; State v. Foster, 40 Iowa, 303; Meece v. Corn, 1 Ky. L. R. 337; State v. Reddington, 7 S. D. 368; Allyn v. State, 21 Neb. 593; State v. Wilson, 42 Kan. 587; People v. Osterhout, 34 Hun, 260; Hobbs v. State, 86 Ark. 360. (3) Appellant, by announcing "ready for trial," and proceeding to trial without objection, waived the provisions of Sec. 5165, R. S. 1909, requiring plea of not guilty to be entered. Frye v. Railroad, 200 Mo. 408; Murphy v. Railroad, 248 Mo. 33; Christenen v. Tank Works, 233 Ill. 142; Wefferman v. Ragsdale, 199 Mo. 382; Bragg v. Street Ry. Co., 192 Mo. 355; Price v. Hallett, 138 Mo. 561; Railway v. Davis, 197 Mo. 680; Hill v. Drug Co., 140 Mo. 437; Stewart v. Onthwaite, 141 Mo. 572; Gordon v. Parke, 202 Mo. 248; Zeikel v. Douglas, 88 Mo. 385;

Taussig v. Railroad, 186 Mo. 284; Sec. 5162, R. S. 1909; State v. Nelson, 132 Mo. 196; State v. Schmidt, 137 Mo. 269; State v. Terry, 201 Mo. 701. Also, see criminal cases under point 2. (4) The statute requiring a plea of not guilty to be entered should now be construed to be merely directory. Secs. 5115, 5165, R. S. 1909; 2 Lewis's Sutherland, Stat. Const. (2 Ed.), sec. 611, p. 1116.

ROY, C.—Defendants were convicted of a violation of the Local Option Law and sentenced each to ten months in jail and to pay a fine of three hundred dollars. They appealed to the Springfield Court of Appeals, where the judgment was affirmed. Judge FARRINGTON dissented on the ground that the majority opinion is in conflict with State v. Hopper, 142 Mo. l. c. 481, and other cases there set out, and the appeal was transferred to this court.

Defendants conceded that the Local Option Law was in force in Dade county. They were partners in business as pseudo-druggists; neither had a license as a pharmacist; nor did they have a pharmacist in their employ. Dr. E. Spyers, a retired physician, having no license as a pharmacist, was employed by defendants. A sale was made of a quart of whiskey to Joe Lindley, under what defendants claimed was a prescription written by Dr. Spyers, signed "E. S., M. D., No. —. Date 4-15." The sale was made by O'Kelley in the store of defendants. The evidence is contradictory as to whether it was in April, July or August, and as to whether defendant Fitch was present. There is no evidence to show that the sale was contrary to the wishes or instructions of the defendant Fitch.

Among other instructions, the court told the jury that if defendants were partners in the store and engaged in the sale of liquor and that O'Kelley was in general management of the business and sold liquor in violation of law, then both were guilty.

The record does not show that defendants were formally arraigned or that they entered a formal plea of any kind. The record proper shows that when the case was called for trial, the defendants appeared in person and by attorneys, and both sides announced ready for trial. The bill of exceptions shows that at the opening of the trial the information was read to the jury by the prosecuting attorney and that counsel for defendants said "No statement at this time except we plead not guilty."

I. The defendants, not having a pharmacist's license, and having no licensed pharmacist in their employ, were not druggists in contemplation of the statute, and had no right to sell whiskey on a prescription or without it. [State v. Workman, 75 Mo. App. 454; State v. Jordan, 87 Mo. App. 420.] Such being the case, it is unnecessary to pass upon the sufficiency of the prescription.

**Druggists: Illegal Sale of Liquor.**

II. The fact that defendant Fitch was not present when the sale was made does not entitle him to an acquittal. By the instruction given the jury were required to find that the defendants were partners in the store and engaged in the sale of liquor. As above stated, neither of the defendants was a pharmacist, nor did they have a pharmacist in their employ, and every sale made by them was unlawful. The very nature of the partnership, so far as the sale of liquor was concerned, was a conspiracy to violate the law, and under these circumstances each was liable for a sale made by the other.

**Sale by One Partner in Absence of Other: No Licensed Pharmacist.**

III. Appellants say that the failure of the record to show a formal arraignment and plea is fatal; although the defendants announced that they were

<div style="float:left; font-size:small">Arraignment<br>and Plea:<br>No Record<br>Showing:<br>Appeal.</div>

ready for trial, and their counsel, when called on for a statement to the jury, said, "No statement except we plead not guilty," and although they took part in the trial without protest or objection to such failure.

In the short period of our history as a territory and a State, criminal procedure has undergone a transformation which may well be called a revolution. By the common law a person charged with a felony was not permitted to have a copy of the indictment, nor was he allowed to have the assistance of counsel, except occasionally to argue a point of law. When arraigned at the bar, if he wilfully refused to plead, he could be sentenced when the charge was treason as on a conviction. In other cases he could be sentenced and imprisoned "strong and hard"—4 Blackstone, p. 325. On his trial neither he nor his wife could testify in his defense. He was not allowed a bill of exceptions, and hence could not be heard in the appellate court on any point involved in the trial save the exceedingly limited number shown by what is known as the record proper.

In 1831, a judgment of conviction in a capital case, Samuels v. State, 3 Mo. 68, was affirmed without the consideration of any question arising on the evidence or instructions. Such being the case, this court was able to consider only the mere stage on which the great drama of the trial had been enacted. It could not know from the record the age, character or the condition in life of the accused or of the deceased, and could know nothing of the guilt or innocence of the accused.

Humane and considerate judges, knowing and appreciating their own inability to see the true merits in criminal cases on appeal were driven by the inequity and injustice of the law to the opposite extreme of looking vigilantly for errors of form and procedure having no reference to the substantial merits of the

case. The Supreme Court of Massachusetts in 1807 in Commonwealth v. Hardy, 2 Mass. 303, said: ''If even to quibble is at any time justifiable a man may quibble for his life.''

We will now review the change wrought by our Legislature. As early as 1808, 1 Ter. Laws, page 218, sec. 37, provision was made for furnishing the accused with a copy of the indictment and with the assistance of counsel. This right was further enlarged by Revised Statutes 1825, page 319, section 22. By the revision of 1835, defendant was allowed to have his bill of exceptions. By the Act of 1877, he and his wife were made competent witnesses in his behalf. Later on provisions were made for stenographic reports of the trial; and, where the accused is not financially able to pay for a copy of the stenographic report, it is furnished to him free. On appeal, even though the defendant files no assignment of errors or brief in this court, it is made our duty, by section 5212, Revised Statutes 1909, to examine the record for errors. [State v. Maggard, 250 Mo. 335.] After performing that duty, though it be found that no error was committed on the trial, yet if the verdict was contrary to the law or evidence, it is our duty to reverse. [R. S. 1909, sec. 5284.] And such duty extends to a case where the verdict is the evident result of the passion or prejudice of the jury. [State v. Prendible, 165 Mo. 329.]

On the other hand, the Legislature has been diligent in the work of destroying the old technicalities and quibbles which have been, from necessity, resorted to by the accused, and often by the court in his behalf. Gradully from 1825 our Statute of Jeofails in criminal cases, now section 5115, Revised Statutes 1909, has been enlarged. Prior to 1879 it was confined to the curing of defects appearing on the face of the indictment. By section 1821 of the revision of 1879, its curative power was extended so as to heal defects occurring in the proceedings not on the face of the indictment. As

thus amended, it provides that the proceedings in a criminal case shall not be held invalid for the errors therein stated, "nor for any error committed at the instance or in favor of the defendant; nor because the evidence shows or tends to show him to be guilty of a higher degree of the offense than that of which he is convicted; nor for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant, upon the merits."

Section 5114, Revised Statutes 1909, prevents the fatal effect of variance between the charge and the proof under the circumstances therein mentioned.

The Legislature has done its full duty. It has enabled the defendant to bring the full record of his case to this court and has ordered us to consider it. It has provided that wherever the verdict of conviction is the result of prejudice on the part of the jury, we shall reverse the judgment and grant a new trial, even though all the forms of procedure were strictly complied with. On the other hand we are forbidden to reverse a judgment for any failure to follow the law, unless such failure tends to prejudice the substantial rights of the defendant on the merits, save the failure of the indictment to fully set forth the offense charged. By force of that curative statute it has been held even in a capital case, State v. Taylor, 134 Mo. 151, that an error in an instruction is not reversible unless prejudicial. In State v. Lovell, 235 Mo. 343, it was held that error in the exclusion of evidence, when not prejudicial, is not reversible. Sections 5162 and 5163, Revised Statutes 1909, provide for furnishing the accused with a copy of the indictment. In State v. Schmidt, 137 Mo. 266, it was held that by pleading and going to trial without objection the defendant waived compliance with that statute. Section 5227, Revised Statutes 1909, provides for furnishing the accused with a list of the jurors. In State v. McLain, 159 Mo. 340, it is held that the defendant, by making his challenges

and proceeding without objection, waived his right to object to such failure.

Before considering our own statute and decisions with reference to the arrignment and plea, we will notice the decisions of other courts. It was held in Crain v. United States, 162 U. S. 625, decided in 1896, that a failure of the record to show the arraignment and plea was fatal. Three of the justices dissented. That court cited Commonwealth v. Hardy, 2 Mass. 303, above referred to. In Commonwealth v. McKenna, 125 Mass. 1. c. 398, the court said: "The defendant having had full opportunity to plead in the district court and having refused to do so, was by this statute to be tried as if he had pleaded not guilty, and having been so tried, the want of a formal entry of such a plea on the record did not prejudice him and was no error." The latter case was decided in 1878 and was overlooked in the Crain case. Grigg v. People, 31 Mich. 471, was also cited, but in People v. Weeks, 165 Mich. 362, it was held that where defendant's counsel announced ready for trial, and filed an affidavit for continuance denying his guilt, and later objected to a postponement of his trial that was asked for by the prosecutor, and where defendant was present during the trial without raising any objection, and heard his counsel in argument to the jury state that he had pleaded not guilty, he waived the right to an arraignment and plea.

Douglass v. State, 3 Wis. 820, was also cited. That case was overruled in Hack v. State, 141 Wis. 346, and it was held that where defendant is fully informed as to the charge against him and is not otherwise prejudiced on the trial by the omission of arraignment and plea, the omission is not error. Cases decided by the Supreme Courts of Illinois and Indiana were cited. But in Weir v. State, 115 Ind. 210, the court said: "If we were inclined to a departure in any di-

258 Mo.—23

rection from the rulings in prior cases, it would be towards the liberality of the statute, which declares that 'In the consideration of the questions which are presented upon an appeal' in a criminal case 'the Supreme Court shall not regard technical errors or defects or exceptions to any decision or action of the court below, which did not, in the opinion of the Supreme Court, prejudice the substantial rights of the defendant.' [R. S. 1881, sec. 1891.]''

And in Fitzpatrick v. People, 98 Ill. 259, and Spicer v. People, 11 Ill. App. 294, it was held that announcing ready for trial is equivalent to a plea of not guilty. It was held that arraignment and plea may be waived in Hobbs v. State, 86 Ark. 361; Brewer v. State, 72 Ark. 145; People v. Bradner, 107 N. Y. l. c. 9; State v. Cassady, 12 Kan. 550; State v. Bowman, 78 Iowa, 519; State v. Straub, 16 Wash. l. c. 113. In Bryans v. State, 34 Ga. l.c. 324, the court said:

"The omission to arraign, in Georgia, furnishes no ground in arrest of judgment; the prisoner cannot, under our criminal system, get any substantial advantage by it. The provisions of the Code and its spirit, in consonance with that of the age, looks only to giving the accused a fair and impartial trial upon the merits of the case, and gives no countenance to the escape of persons charged with crime, upon mere technicalities. The day has passed, and never to return, when the course of justice could be arrested by trifles and objections having no substantive weight.

"Whilst we give such expression to our opinions, we will not, by construction, deprive a person accused of any safeguard to which he is clearly entitled by law; but we cannot allow him to sit by silently, with eminent counsel by his side, all cognizant of a casual omission of what is considered mostly a form, and which is uniformly waived when requested, and to snatch, in consequence of it, as it were by indirection, a verdict of not guilty.''

These decisions of other States were in some instances based on statutes similar to ours, and in other cases, not. The cases are too numerous to undertake to distinguish them.

We will now review the decisions in our own State. In State v. Saunders, 53 Mo. 234, it was held that the failure of the record to show arraignment and plea was fatal. There was no discussion of authorities. That case was followed and cited without further discussion in State v. Montgomery, 63 Mo. 296.

State v. Agee, 68 Mo. 264, merely said: "As the record shows no arraignment of defendant, this, under repeated adjudications, must accomplish a reversal of the judgment." That case was decided at the October term, 1878. Immediately following that case, by the revisions of 1879, section 1821, the Statute of Jeofails was amended so as to cure errors not on the face of the indictment.

State v. West, 84 Mo. 440, held that the absence of arraignment and plea was fatal without citing any authority and without discussing the effects of the amendment of the statute.

In State v. Vanhook, 88 Mo. 105, the court said: "After the jury is sworn and the trial proceeds, and all the testimony relates to the guilt or innocence of the accused, in a misdemeanor case, it looks like trifling with justice to reverse the judgment because the record fails to show an arraignment and plea of not guilty; but it has been held in a number of cases that this is a fatal error, and it is for the Legislature, and not for this court, to change the law on the subject."

In State v. Williams, 117 Mo. 379; State v. Walker, 119 Mo. 467; State v. Hopper, 142 Mo. 478, error was confessed, and the point was held fatal.

In State v. Witherspoon, 231 Mo. 706, it was said that an arraignment is prerequisite to a legal trial, but in that case there was an arraignment and plea.

The learned jurists who, after the amendment of the statute, reversed cases for the want of an arraignment and plea, did so, we believe, because the curative force of the statute as to that question was overlooked. They said that such reversal "Looked like trifling with justice," and that it was a matter for the Legislature.

The Legislature had already acted; and we, obeying its mandate, decline to reverse for such cause. We are also of the opinion that the conduct of defendants and their counsel as stated amounted to a waiver of an arraignment and plea.

**Waiver.**

The judgment is affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.

FARIS, J.—I concur with my brethren of this division in adopting the opinion of Roy, C., but I deem the importance of the holding such, as that a decent respect for the opinions of bench, bar and laity impel a more extended review of the compelling reasons which urge me to give my assent to a doctrine which in this State is well nigh revolutionary. I am not concurring and shall not concur for any half-way or half-hearted reason, as for that in the instant case, counsel spoke into the bill of exceptions, unintentionally and by inadvertence, a plea of not guilty, which plea was thus preserved in a place where it had no legal right to be and is here by accident made to play the unwilling role of a waiver for use in this case only. A concurrence for such an adventitious reason, would do no good and get us nowhere, but would be but a mere revolving around the old sticking point; it would be to reach but not to cross the *pons asinorum.*

The failure of the record affirmatively to show that defendants entered a plea of not guilty is the

point here chiefly vexing us, and the sole one which
I purpose discussing. Since we must, out of absolute
necessity, impute verity to a record in a criminal case,
certified to us by the clerk of the trial court, we are
forced to presume that the absence of a showing that
such a plea was entered by defendants proves con-
clusively that it was not entered by them nor for them,
and that they went to trial without a formal denial
of their guilt. [Crain v. United States, 162 U. S.
625.] Upon the actual question of guilt or innocence,
which is tried and determined in any criminal case,
there is but one plea or answer, that is, "not guilty."
In the last analysis, some defenses are apparently in
their nature confessions and avoidances, as for ex-
ample, the defense of self-defense. But all and all
such are comprehended and encompassed by the plea
or answer of defendant, orally entered, that he is not
guilty. The State avers the defendant is guilty; he
says that he is not guilty, and an issue is thus made
up to be tried by a jury of the country. So important
was the making up of this issue at common law that
a case never proceeded till it was made up. So solici-
tous were the courts at an early day (regrettably this
mistaken solicitude survived to a day so near to our
own as to be almost unthinkable) that if a defendant
refused to plead either guilty or not guilty to the
ordinary felony, that is, if he stood mute, he was
imprisoned "till he answered" (Britton c. 4 and 22;
Fleta, 1. 1 t. 34, sec. 33) except in treason, where
standing mute was always equivalent to a plea of guilty
—and the accused was condemned and executed with-
out any further procedure. If he refused to plead to
a felony other than treason the judgment was "that
the prisoner be remanded to the prison from whence
he came, and put into a low, dark chamber, and there
be laid on his back, on the bare floor, naked, unless
where decency forbids; that there be placed upon his
body as great a weight of iron as he could bear, and

more; that he have no sustenance, save only, on the first day, three morsels of the worst bread; and on the second day, three draughts of standing water, that should be nearest to the prison door, and in this situation this should be alternately his daily diet till he died, or (as anciently the judgment ran), *till he answered.*" [4 Cooley's Black., 327.]

The matter of compelling a plea by solitary imprisonment without sustenance seems to have arisen from a statute, passed in the reign of Edward I. [4 Black. Com., 327.] From the time of the latter till the reign of Henry IV., solitary imprisonment practically without food or water alone was adjudged till the accused answered, but no weights were laid upon the body, so as to hasten death, but as Blackstone says: "I should imagine that the practice of loading him [the accused] with weights, or, as it was usually called, *pressing him to death,* was gradually introduced between 31 Edw. III. and 8 Henry IV., at which last period it first appears upon our books; being intended as a species of mercy to the delinquent by delivering him the sooner from his torment; and hence I presume it also was that the duration of the penance was then first altered; and instead of *continuing till he answered,* it was directed to *continue till he died,* which must very soon happen under an enormous pressure." [4 Black. Com., 328.]

In the twelfth year of the reign of George III. a statute was enacted which changed the above rule —already changed I gather by desuetude, though still the law—by providing "that every person who being arraigned for felony, shall stand mute or not answer directly to the offense shall be convicted of the same" (4 Black. Com., 329), just as if in all respects a plea of guilty had been rendered. Later, and in the time of George IV., and long after Blackstone wrote, a statute was passed by the English Parliament, similar to our own Missouri statute hereafter discussed, pro-

State v. O'Kelley and Fitch.

viding, in substance, that when the accused stood mute a plea of not guilty should be entered of record for him. [7 & 8 Geo. IV. c. 28.]

When we adopted the common law and the statutes in force in England, which we did by the Act of January 19, 1816, we got all of the statutes of England, of a general nature, "made prior to the fourth year of James the First," which were not contrary to our territorial laws then in force and not contrary to the Constitution and laws of the United States. [Laws of the Territory of Mo., p. 436.] With such statutes, if it was a statute—and if not, then as a part of the common law (4 Black. Com., 328.; Yearbook, 8 Henry IV. 1) we got the law of procedure when no plea, either of guilty or not guilty, was entered by the accused. We did not get the statute of 12 Geo. III. c. 20, which declared that standing mute in all felonies was tantamount to a plea of guilty, but Blackstone leads us to infer, without so saying specifically, that the rule of inflicting *peine forte et dure* had fallen for years into disuse; that the procedure in all trials for felonies, when the accused stood mute, had been so far colored and influenced by the rule of practice under similar circumstances in trials for treason, that the Statute of Geo. III. c. 20, was merely declaratory of the practice prevailing in all cases for several hundred years prior. At least Blackstone tells us that such doubts were held as to its legality and such repugnance entertained to the theory of the rule that it was rarely carried into practice, and public opinion at last brought pressure to bear to pass a statute abolishing torture to compel a plea.

I have said so much in order to ascertain whether section 5165 of our statute, which is the lion here in the path, is a limitation of the common law, or a grant to the accused of a right not possessed by him at common law. It is fairly plain that it partakes more nearly of the nature of a right granted, than of a

limitation imposed. For we have seen that even before the passage of a statute which we did not get when we renounced the Spanish law and took over the common law, the failure to enter a plea had the effect of a conviction, not indeed pursuant to trial upon the charge before the court, but the accused was executed without trial because he would not plead. The only punishments were fines, jail sentences in later times, stripes and death—mostly the latter—for all offenses great and small, for there were no penitentiaries. Then more than two hundred offenses were punishable by death. (Encyc. Brit. says there were 200 capital crimes in the year 1800; 180 in 1819; Blackstone says there were more than 160 in 1789; see 4 Black. Com. 18.] Since attainder and corruption of blood followed conviction either by trial or by confession, and since the property of the accused thereupon escheated to the feudal lord, and since conviction in every case was well-nigh certain, and death followed fast at the heels of conviction, it is no great wonder that there were those willing to suffer death by *peine forte et dure* in order to save their property from escheating and their families from becoming paupers. Neither is it any great wonder that a shocked public conscience thoroughly aroused by the horrible injustice and brutality of the early criminal law, should when the awakening came have gone as it did to the other extreme and provided well-meant safeguards for the defendant's protection and benefit, which have now grown to be pitfalls for the lagging feet of justice. Great reason there was, when the theft of twelve pence, or of a sheep, or of a piece of woolen cloth, or the killing of a deer was punishable by death and the means of an active affirmative defense were withheld, that every safeguard, though built up of silly fictions, as, for example, benefit of clergy and of sanctuary, should be invoked to save one driven to such crime by hunger or other compelling extremity.

The several States, when the War of the Revolution rendered the statute 7 and 8 George III. c. 28, noneffective here, passed statutes very similar to ours, which was passed in its present form in 1835, except that the word "information" was added to it in 1879. [Sec. 5, p. 485, R. S. 1835.] Ever since, this section has read thus:

"When any person shall be arraigned upon any indictment or information, it shall not be necessary to ask him how he will be tried; and if he deny the charge in any form, or require a trial, or if he refuse to plead or answer, and in all cases when he does not confess the charge to be true, a plea of not guilty shall be entered, and the same proceeding shall be had, in all respects, as if he had formally pleaded not guilty to such indictment or information."

I think it logically follows, regard being had to the precise evil intended to be corrected by the statute 7 & 8 Geo. II. c. 28, and by section 5165, which was passed in the same spirit, for the same reason and to correct the same ill, that the intent and spirit of this section was absolutely fulfilled, when by reason of its provisions, the accused was in fact accorded a fair trial, in all respects as if he had pleaded not guilty, instead of being pressed to death or executed for that he had failed to answer or plead at all. Nevertheless, we may not blink the fact that a failure to enter a plea of not guilty, or that which is, as we have seen, tantamount to it, a failure of the record to show that such a plea was entered, has always been, in every jurisdiction (till of late a few are breaking away), reversible error. [Crain v. United States, 162 U. S. 625; Bowen v. State, 98 Ala. 83; People v. Gaines, 52 Cal. 479; Ray v. People, 6 Colo. 231; Parkinson v. People, 135 Ill. 401; Johns v. State, 104 Ind. 557; State v. Wilson, 42 Kan. 587; State v. Fontenette, 45 La. Ann. 902; Grigg v. People, 31 Mich. 471; Sartorious v. State, 24 Miss. 602; State v. Hopper, 142 Mo. 478;

State v. Williams, 117 Mo. 379; State v. Taylor, 111 Mo. 448; State v. Saunders, 53 Mo. 234; State v. Montgomery, 63 Mo. 296 (and some 25 or 30 others); Browning v. State, 54 Neb. 203; State v. Cunningham, 94 N. C. 824; State v. Moore, 30 S. C. 69; Shaw v. State, 17 Tex. App. 225; Stoneham v. Com., 86 Va. 523; Lanphere v. State, 114 Wis. 193; Davis v. State, 38 Wis. 487; 12 Cyc. 344; 2 Ency. Pl. & Pr. 761-792.]

"The plea of not guilty," says Wharton, "contests all of the material averments of the indictment." [Wharton, Crim. Pl. and Pr., 408.] The right of arraignment on a criminal trial may in some cases be waived, but a plea is always essential. [Warren v. State, 13 Tex. App. 348; Ray v. People, 6 Colo. 231; Wharton, Crim. Pl. and Pr. 409.] The court cannot at common law supply an issue after verdict where there has been no plea (Long v. People, 102 Ill. 331), notwithstanding the defendant consented to go to trial. [Hoskins v. State, 84 Ill. 87; Gould v. People, 89 Ill. 216; Bowers v. State, 108 Ind. 411; Douglass v. State, 3 Wis. 820; Lacefield v. State, 34 Ark. 275; People v. Gaines, 52 Cal. 480; Bates v. State, 12 Tex. App. 139.] And a failure of the record to show a plea is a fatal defect. [Wharton, Crim. Pl. and Pr., 409; Huddleston v. State, 14 Tex. App. 73.]

So until lately stood practically all the law, so far as *stare decisis* could interpret it. Statutes like ours in practically all of the States have stood for years as latent stumblingblocks of bald, naked technicality, cumbering the path of justice and the legal earth, subserving no appreciable present good. What reason can now be urged for retaining as reversible error the nonobservance of a rule which after all but guarantees to defendant, whether he pleads or not, a trial in all respects as if he had pleaded, and when in fact he actually gets the same sort of trial? In this day and age and condition of the law no reason now exists for such a rule, nor has any such existed these

thirty-five years, and we would as well cast it into the dust-heap of useless and abandoned technicality.

I am mindful of the intimation by a divided court in the case of Crain v. United States, 162 U. S. 625, that a statute which would utterly deny the necessity of entering a plea or having one entered, and which in effect would in all cases force a defendant to trial without an issue made up to try, might possibly violate the provisions of the Fourteenth Amendment to the Constitution of the United States. But even should such a holding be squarely made by the Supreme Court of the United States (and in the Crain case, Mr. Justice (now Chief Justice) WHITE, Mr. Justice PECKHAM and Mr. Justice BREWER dissented), yet in my view this holding would not prevent the passage of an act by our Legislature to the effect that a going to trial by the accused without the entering of a formal plea of not guilty, or the fact that the record fails to show such a plea, should not after verdict, no objection or exception being thereto timely lodged, constitute reversible error, on the ground that failure to interpose timely objection and the act of announcing ready and proceeding to trial and participating therein, operated as a waiver of the failure to plead. This ought to have been done years ago.

Time after time the conference of judges (R. S. 1909, sec. 3892) has requested the Legislature to pass a law obviating reversal of criminal cases for this senseless, useless and piffling reason. [No. 2 of Recommendations of Conference of Judges to 47th General Assembly.] No attention has been paid to this recommendation. In the light of the construction put upon this section of our statute by a body made up of all of the judges of this State, it will not suffice to say that this section, without legislative action or judicial interpretation, does not mean what it says, nor what this court for ninety years, and nearly every other court in every other jurisdiction, has always said it meant.

But I concur with the views of my associates and of the learned Commissioner, that justice ought no longer to be trifled with and defeated for lack of some body to act. However, I do not think that the courts ought to be asked to do all of the reforming, of which much is now confessedly necessary in both civil and criminal practice and procedure, nor have they the power to do so, without assuming authority by an arrogant aggression, which could subject them to impeachment. Technicalities, so-called, and actually such so far as the good subserved by them is concerned, are planted thick in our statute law. In our Constitution even, they lie scattered through each article almost "thick as leaves which strew the brooks at Vallombrosa." Daily odium is heaped upon the courts because they must needs follow the Constitution, when the Constitution itself is fostering and protecting moss-covered technicalities. Many examples of such Constitution-begotten technicalities could be amazingly marshaled here; let two or three suffice: the repetitious, involved and technical verbiage of indictments of all kinds is prescribed and preserved by the organic law (Sec. 22, Art. II, Cons. of 1875); likewise the rule which forbids the State to take depositions in a criminal case (Sec. 22, Art. II, Cons. of 1875); as also the provision arbitrarily prescribing the manner in which indictments and informations shall conclude. [Sec. 38, Art. I, Cons.] Many more might be added to this list. Abortive and defective efforts of the prosecuting officers to follow these provisions of our Constitution have served to reverse the cases of more than a hundred men, all guilty, presumably, for the juries so found them to be (State v. Murphy, 141 Mo. 267; State v. Plant, 209 Mo. 307; State v. Wade, 147 Mo. 73; State v. Burks, 159 Mo. 568, and others too numerous to mention); other hundreds have gone unwhipt of justice because the witnesses against them stepped across the State line and stayed there. [State v. Berkley, 92 Mo. 41; State v. Dyke, 96 Mo.

298.]   I am not criticizing these provisions, nor am I passing upon their wisdom or unwisdom. The people gave them to us, and it is for the people alone to take them away. I am stating only that which has happened many score of times by reason of them, and saying that if in the last analysis, they do now more good than harm it is utterly impossible for the ordinary finite mind to perceive wherein it lies. It will not entirely answer to say that a thing which is prescribed by a Constitution ordained and adopted by the sovereign people, *can never be in any legal sense a technicality.* This, for the reason that since it is solemnly ordained by the people themselves in furtherance of that likewise solemnly ordained prescription of the basic reasons for the existence of government at all, viz.: "That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty and the enjoyment of the gains of their own industry; that to give security to these things is the principal office of government, and that when government does not confer this security it fails of its chief design" (Sec. 4, Art. II, Cons. of Mo. 1875), therefore it is a right rule of action, and must be fairly followed and interpreted with honesty and horse-sense. But we would be utterly blind and deaf to things which all other men know if we were to lay the unction to our souls that reversals of the cases of guilty men for that, rights and safeguards solemnly granted to the citizen by the sovereign people in the Constitution have been ruthlessly violated, are always today condoned, excused or even accepted tolerantly by the public. Similarly, many ancient, outgrown and useless statutes, like the one here vexing us, cumber the books, and in spite of us make reversals necessary, which would often otherwise be unnecessary. I cannot square it with my duty to override wilfully a people-made Constitution, nor unless overpowering reason urge, a statute made by the rep-

resentatives of the people freshly accredited by their suffrages, simply because to my mind and in my opinion, the law is wrong or the Constitution is ill-advised and unfitted to the uses of these days. What assurance have I that it may not be my mistake; I, it may be, am suffering from a jaundiced view, or from strabismus of the mental machinery, and the Constitution and the law may be right? So much is said, as tending, if possible, to show that the responsibility is divided, as Gaul was said to have been, into three parts, and that the people and the Legislature and the courts should, in fairness each toward the other, assume their just proportion of the burden and the odium of permitting justice to be delayed or denied by reason of the operation of any ancient, worn-out technicality, the very reason for whose origin and existence has been lost in the dim mazes of antiquity.

When however, legislative action has been requested as has been done upon the statute before us, and none such looking to relief has been afforded, and when other courts outraged by the existence of a like useless statute, are ridding themselves of it by judicial construction, we ought not to lag behind. We ought to assume, as the majority opinion does, that mayhap the Statute of Jeofails applies, and that light has descended upon us only after thirty-five years. This precise point in a like case, upon a similar statute apparently, was lately before the Supreme Court of Wisconsin in the case of Hack v. State, 141 Wis. 346. Touching it that court said:

"The ancient doctrine that the accused could waive nothing was unquestionably founded upon the anxiety of the courts to see that no innocent man should be convicted. It arose in those days when the accused could not testify in his own behalf, was not furnished counsel, and was punished, if convicted, by the death penalty or some other grievous punishment out of all proportion to the gravity of his crime.

Under such circumstances it was well, perhaps, that such a·rule should exist, and well that every technical requirement should be insisted on, when the state demanded its meed of blood.  Such a course raised up a sort of a barrier which the court could utilize when a prosecution was successful which ought not to have been successful, or when a man without money, without counsel, without ability to summon witnesses, and not permitted to tell his own story, had been unjustly convicted, but yet under the ordinary principles of waiver, as applied to civil matters, had waived every defect in the proceedings.

"Thanks to the humane policy of the modern criminal law we have changed all these conditions.  The man now charged with crime is furnished the most complete opportunity for making his defense.  He may testify in his own behalf; if he be poor, he may have counsel furnished him by the State, and may have his witnesses summoned and paid for by the State; not infrequently he is thus furnished counsel more able than the attorney for the State.  In short, the modern law has taken as great pains to surround the accused person with the means to effectively make his defense as the ancient law took pains to prevent that consummation.  The reasons which in some sense justfiied the former attitude of the courts have therefore disappeared, save perhaps in capital cases, and the question is, Shall we adhere to the principle based upon conditions no longer existing?  No sound reason occurs to us why a person accused of a lesser crime or misdemeanor, who comes into court with his attorney, fully advised of all his rights and furnished with every means of making his defense, should not be held to waive a right or privilege for which he does not ask, just as a party to a civil action waives such a right by not asking for it.

"Surely the defendant should have every one of his constitutional rights and privileges, but should he

be permitted to juggle with them? Should he be silent when he ought to ask for some minor right which the court would at once give him, and then when he has had his trial, and the issue has gone against him, should he be heard to say there is error because he was not given his right? Should he be allowed to play his game with loaded dice? Should Justice travel with leaden heel because the defendant has secretly stored up some technical error not affecting the merits, and thus secured a new trial because forsooth he can waive nothing? We think not. We think that sound reason, good sense, and the interests of the public demand that the ancient strict rule, framed originally for other conditions, be laid aside, at least so far as all prosecutions for offenses less than capital are concerned.''

The New York courts have upon the point held like views. For it was said in People v. Osterhout, 34 Hun, 260:

''The defect is merely technical, affecting no rights whatever. . . . Nor may this court on appeal regard technical errors or defects or exceptions which do not affect substantial rights.'' [Referring to a statute from which ours was copied.] ''If this section is to have any meaning at all it applies exactly to a case like the present. . . . Every one who knows anything of a criminal trial must see that the omission did the defendant no harm. . . . Where the prisoner appears with his own counsel, the omission formally to arraign and ask for a plea is immaterial to his rights and may be deemed to be waived.''

And in the case of People v. Bradner, 107 N. Y. 1, it was said:

''A formal plea of not guilty is not necessary to put the defendant on trial. Further, in effect, going to trial as if an issue were framed, all participants acting as if all formalities had been complied with, is equivalent to arraignment and plea. It would be sacrificing substance to form not to give effect to the

transaction according to the plain understanding of the court and the parties."

The Supreme Court of Washington likewise took this view, as witness this excerpt from State v. Straub, 16 Wash. 111, and while conceding cheerfully the common-law rule, which confessedly the opinion abrogated, it was said:

"We think, under the system adopted by the Code in this State, that such an omission is purely technical, that it does not affect any of the substantial rights of the defendant, and that, if otherwise properly convicted, the judgment should not be reversed. Indeed, this is the holding of many modern courts under statutes similar to ours."

The Supreme Court of Michigan in a very late felony case, upon the same point reached the same conclusion upon the identical facts here and held that, upon a trial in such a case where defendant is neither arraigned nor pleads not guilty, nor has any plea entered of record for him, but where his counsel announces for him that he is ready for trial, and later files an application for a continuance denying guilt, and objects to a continuance by the State, and urges upon the jury in argument that defendant is not guilty, all without objection, defendant thereby waived the right to urge reversible error as arising from lack of arraignment and plea. The Michigan court, in the course of its able opinion, quotes with approval the view of Justice MARSHALL of the Supreme Court of Wisconsin, concurring in Hack v. State, supra, thus:

"While in my judgment the decision here is conformable to and required by the law of 1856 and numerous decisions that rights, even of a fundamental character, may be waived in a criminal, as well as in a civil case, overruling the principle of Davis v. State, 38 Wis. 487, I claim for the court inherent power and duty to reach the same result independently of legisla-

258 Mo.—24

tive assistance. The doctrine of Davis v. State as to arraignment and plea not being waivable, is wholly of judicial creation. Not only, as said by the Chief Justice, have the basic reasons which suggested such doctrine as a guard against injustice long since ceased to exist, but just as weighty reasons, prior to the legislation of 1856, called for its abrogation as a useless interference with the due administration of justice. The inherent power of the court, which originated the doctrine to satisfy seeming requirements of the social state which no longer exist, may properly be used to lay it aside as a legal curiosity, appreciable only by a knowledge of its antecedents, and inadaptable for any beneficial purpose in our modern life.''

The logic and unanswerable reasons for the view which I take are so clearly and ably set out in the dissenting opinion of Mr. Justice PECKHAM, in Crain v. United States, supra, at page 648, that I quote:

''Suppose, however, the defendant through mere inadvertence had not been formally arraigned at the bar, and had not in terms pleaded, but that he was placed on trial without objection on his part, and both sides treated the case as if he had been arraigned and pleaded not guilty, could it be plausibly contended that, nevertheless, a fatal error had been committed by a neglect of this form, and that a judgment of conviction must on that account be reversed? Is it possible that for the first time a defendant can in this court successfully raise this formal objection, and under circumstances showing a waiver of the rule, and yet obtain a reversal of the judgment of that ground alone? To my mind the mere statement of these questions furnishes their conclusive answer. Some cases may hold the necessity of a formal plea and that the conduct of a defendant in going to trial without any objection, and as if a plea of not guilty had been entered, did not waive the necessity of such a plea. Those

cases are not based on principles which, in my judgment, ought now to be followed.

"Here the defendant could not have been injured by an inadvertence of that nature. He ought to be held to have waived that which under the circumstances would have been a wholly unimportant formality. A waiver ought to be conclusively implied where the parties had proceeded as if defendant had been duly arraigned, and a formal plea of not guilty had been interposed, and where there was no objection made on account of its absence until, as in this case, the record was brought to this court for review. It would be inconsistent with the due administration of justice to permit a defendant under such circumstances to lie by, say nothing as to such an objection, and then for the first time urge it in this court."

The very same point has been up for ruling or discussion in many other States and, while I concede the condition of the common law as shown by excerpts from, or citations of, cases from many other jurisdictions and from text-books and other authorities which I cite (cf. 12 Cyc. 344; 1 Chitty's Crim. Law, sec. 419; Wharton, Crim, Pl. and Pr., 409; 2 Ency. Pl. & Pr., 761 et seq., and cases cited from other States, supra) there are latterly growing up a legion of courts, outside of those cases from which I quote, where the point has been held a cumbering, bald technicality which is waived by going to trial without objection. [Molihan v. State, 30 Ind. 266; State v. Hayes, 67 Iowa, 27; Fernandez v. State, 7 Ala. 511; Hudson v. State, 117 Ga. 704; State v. Thompson, 95 Iowa, 464; Bateman v. State, 64 Miss. 233; People v. Tower, 17 N. Y. Supp. 395; State v. Greene, 66 Iowa, 11; Avery v. People, 11 Ill. App. 332; see, also, cases cited by our learned Commissioner.]

For these reasons then, in addition to those so learnedly suggested in the opinion of Roy, C., I concur. But I think, as I said in the beginning, that our views

on this question should be so broadly inclusive as to comprehend more than this instant misdemeanor case, wherein by accident largely, counsel for defendant happened to say by way of argument to the jury, that defendants were not guilty. Such accidental statement by way of waiver and urged here as constituting waiver may not occur again in a case before us in a hundred years. I am thoroughly convinced, that outside of such argument as may be urged in favor of the statute under discussion, merely because it is a statute and because the Legislature has neglected to amend it, after its usefulness has been shown and its amendment suggested by the conference of judges, no right of defendant is protected and no purpose is subserved by it when defendant, in any case (except a trial for a capital offense), is tried in every respect as if he had entered a plea of not guilty, or had such plea entered for him. I believe we should flatly hold that unless objection is made by the defendant for failure of the record to show a plea before the trial jury is sworn, his announcement of being ready for trial, his participating therein in person in a misdemeanor case, or in person and by counsel in any trial where conviction follows for a felony less than capital, ought to be taken and deemed by this court after verdict as a waiver of both arraignment and entry of a plea of not guilty, and that we should no longer hold that to be reversible error, which our common-sense tells us is not hurtful error, and that the case of State v. Andrews, 27 Mo. 267, and all other cases which have followed it in announcing a rule in conflict with the views herein, should be overruled and no longer followed. *Walker, P. J.* and *Brown, J.,* concur in these views.